**In re McMILLAN, RAPP & CO.**

Nos. 7720–7723.

Circuit Court of Appeals, Third Circuit.

Nov. 3, 1941.

David F. Maxwell, of Philadelphia, Pa. (George B. Clothier, Leon J. Obermayer, and Edmonds, Obermayer & Rebmann, all of Philadelphia, Pa., on the brief), for appellant.

Roland C. Heisler, of Philadelphia, Pa. (Drinker, Biddle & Reath, of Philadelphia, Pa., on the brief), for appellees Leaver and Weiss.

Francis F. Burch, of Philadelphia, Pa. (George O. Philips, of Philadelphia, Pa., on. the brief), for appellee Thomas.

Paul Freeman, of Philadelphia, Pa. (Freeman, Fox & Steeble, of Philadelphia, Pa., on the brief), for appellee Freeman.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The trustee of McMillan, Rapp & Company, bankrupt, appeals from four separate decrees of the District Court awarding to each of four customers of the bankrupt reclamation of securities which they had severally purchased through the bankrupt but which remained in the bankrupt's possession at the date of bankruptcy.

In so far as the facts are legally significant, they are substantially the same with respect to the claims of three of the customers, viz., Leaver (No. 7720), Weiss (No. 7721) and Thomas (No. 7722). Moreover, the factual differences, which will be noted, with respect to the claim of the fourth customer, Freeman (No. 7723), do not seem to distinguish his claim from the others.

McMillan, Rapp & Company, a corporation, was adjudicated bankrupt on February 20, 1940, upon a voluntary petition. The company had been engaged in the investment business in Philadelphia and in some instances had acted as a stockbroker. Among the assets found by the trustee in the bankrupt's possession were various certificates, in the name of one or another of the four claimants, for stock which they had severally purchased through the bankrupt, and had paid for in full, either with stock subscription warrants and cash or entirely with cash, all within four months of the date of bankruptcy and while the bankrupt was insolvent.

In the cases of Leaver, Weiss and Thomas, the stock certificates in their respective names were in separate envelopes each bearing the name of the particular owner of the enclosed shares and were so deposited in the bankrupt's safe deposit box, where they remained until the date of bankruptcy. None of these certificates, nor the certificates in Freeman's name which also remained in the bankrupt's possession, had been endorsed nor were they accompanied by any stock transfer power. In each instance (except for some bank stock purchased by Weiss) the bankrupt first accepted delivery of the purchased stock in a street name and thereafter sent the certificates in the street name to the transfer agent for transfer to the particular customers. In the case of Freeman, his purchase of the stock to which he lays claim was begun on margin but, prior to the bankruptcy, he had paid his debit balance in full and had demanded the certificates for his stock which were transferred to his name but were not delivered by the bankrupt which retained possession thereof. None of the claimants was indebted to the bankrupt.

The principal question here involved is whether the claimants made out a case for reclamation within the requirements of Section 60, sub. e of the Bankruptcy Act, as amended.[1]

There is an incidental question which was raised below as to whether the bankrupt was a stockbroker. The referee found that it was. Upon that finding depends the applicability of Section 60, sub. e. The District Court, upon a review, approved the referee's finding in such regard and, in so doing, we think acted properly. Notwithstanding the bankrupt had generally conducted an investment business and, consequently, had ordinarily acted as principal and not as agent, it is plain that, in respect of the stock purchases involved

[1] Act of June 22, 1938, c. 575 § 1, 52 Stat. 869, 11 U.S.C.A. § 96, Pht.Supp. pp. 168, 169.

in the present appeals, the bankrupt acted as broker or agent for these claimants. It follows, as a matter of law, that the instant claims are subject to the provisions of Section 60, sub. e. Do they satisfy the statutory requirements?

Paragraph (2) of Section 60, sub. e provides that "All property at any time received, acquired, or held by a stockbroker from or for the account of customers, *except cash customers who are able to identify specifically their property in the manner prescribed in paragraph (4) of this subdivision* and the proceeds of all customers' property rightfully transferred or unlawfully converted by the stockbroker, shall constitute a single and separate fund; and all customers except such cash customers shall constitute a single and separate class of creditors, entitled to share ratably in such fund on the basis of their respective net equities as of the date of bankruptcy: * * *." (Emphasis supplied.)

■ "Cash customers" are defined by paragraph (1) of Section 60, sub. e as being "customers entitled to immediate possession of such securities without the payment of any sum to the stockbroker." Under this definition the present claimants were cash customers. They had fully paid for their stock purchases and were not otherwise indebted to the bankrupt.

As to the manner of identifying specifically the property of cash customers, paragraph (4) of Section 60, sub. e, stripped of matter not presently applicable, provides that "* * * *no securities* * * * *received by a stockbroker* * * *for the account of a cash customer* * * *pursuant to purchase* * * * shall * * * be deemed to be specifically identified, unless *such* property remained in its identical form in the stockbroker's possession until the date of bankruptcy, * * *." (Emphasis supplied.) An alternate means of identifying property is also prescribed but is not presently important; as it is unavailable to these claimants under the attending circumstances. All of the stock involved in the pending cases was purchased by the stockbroker for the claimants' accounts within four months of the bankruptcy and while the stockbroker was insolvent.

■ The question, therefore, is whether the stock received by the stockbroker for the respective accounts of these cash customers pursuant to purchase remained "in its identical form in the stockbroker's possession until the date of bankruptcy." The learned court below held that it did and, with that conclusion, we agree. The referee, who had held to the contrary, treated the cash and stock subscription warrants which the customers had transferred to the stockbroker in payment of their purchases as being the property which had to remain in its identical form in order that the customers might be able to reclaim it after bankruptcy under the relevant clause of paragraph (4). Such a construction ignores the provision of paragraph (4) which makes it applicable to "securities * * * received by a stockbroker * * * for the account of a cash customer * * * pursuant to purchase." Patently, this does not contemplate that the securities so received by the stockbroker shall be the property which the purchasers deposited or paid for their purchases. In the very nature of the transaction, a customer's ownership of the new securities does not arise until they are received by the stockbroker for the customer's account pursuant to the authorized purchase. The trustee, presumably perceiving the evident error in the referee's construction, now argues that the securities which the stockbroker received for the accounts of the present claimants pursuant to purchase were the certificates in street name, whereof the stockbroker first accepted delivery, and which, admittedly, did not remain in their identical form in the stockbroker's possession until the date of bankruptcy. But, the transfer of the certificates out of street name into the names of the purchasers was but a step in the purchase pursuant to which the stockbroker ultimately received the certificates in the purchasers' names for their accounts.

■ We conclude therefore that where, prior to a stockbroker's bankruptcy, a customer purchases securities through the broker for cash or its equivalent in the ordinary course of business and the broker receives, pursuant to the purchase for the customer's account, stock certificates in the name of the purchaser which remain in their identical form in the broker's possession until the date of bankruptcy, the customer, if he is not indebted to the broker, may thereafter claim the stock as his own free and unencumbered property. This rule obtains regardless of how long before the stockbroker's bankruptcy the transaction took place and regardless of

the broker's current insolvency so long as there is no question of the creation of a preference which is otherwise taken care of by Section 60, sub. e and as to which both the period before bankruptcy and the broker's insolvency are material. We believe that the construction which we thus place upon paragraph (4) is what the plain words of the statute reasonably require and that, so construed, the provision effectuates the evident intent of Congress.

Section 60, sub. e is new, having been introduced into the bankruptcy law by the Chandler Act. So far as we are advised, paragraph (4) has not heretofore been judicially construed except by the District Court in the instant cases. Clearly, the purpose of the provision was to correct a very definite and well-recognized situation. Prior to the enactment of Section 60, sub. e, inequalities had developed in the distribution of a stockbroker's estate in bankruptcy due to the fact that some purchasers of stock on margin or depositors of stock or other property were able to lift their stocks or property from the possession of the bankrupt's estate upon paying any debit balances due by them, while others were left with nothing more than claims as general creditors of the bankrupt because there was insufficient stock of a particular kind in the estate or none at all to allocate to their accounts.[2] So that, although two customers stood in the same relation to the stockbroker as the owners

of stock acquired or held for them subject to debit balances, one was able, upon the stockbroker's bankruptcy, to obtain preferential treatment over the other depending upon the mere accident of circumstance.

This inequality among claimants of the same status had long been noted and the need for its correction had been the subject of considered comment.[3] It was to remedy this inequity that Congress inserted Section 60, sub. e into the bankruptcy law with the enactment of the Chandler Act.[4] The effect of Section 60, sub. e was to place all margin customers of a stockbroker in a single and separate class whose participation in the distribution of the stockbroker's estate in bankruptcy is limited to the single and separate fund composed of the proceeds of such customer's property, rightfully transferred or unlawfully converted by the stockbroker, and in which fund such customers share ratably according to their respective net equities as of the date of bankruptcy. Cash customers whose property had likewise been transferred or converted by the stockbroker are subject to the same provision unless the property (received by the stockbroker from them for sale, etc., or *for them pursuant to purchase*) remains in its identical form, as so received, until the date of bankruptcy or unless such property or any substitutes therefor or proceeds thereof were, more than four months prior to bankruptcy or while the stockbroker

---

[2] Stocks being considered fungible property, a customer's claim against a bankrupt stockbroker for a certain number of shares of a particular stock has been traceable merely from the fact that the broker had in his possession at the time of bankruptcy a sufficient number of shares of the same kind of stock even though the certificates for the stock acquired or held by the broker for the customer's account had been otherwise disposed of or pledged by the broker. Gorman v. Littlefield, 229 U.S 19, 24, 25, 33 S.Ct. 690, 57 L.Ed. 1047; Richardson v. Shaw, 209 U.S. 365, 379, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981; Lavien v. Norman, 1 Cir., 55 F.2d 91, 96. This rule was the the consequence of the generally prevailing rule of property that title to stocks purchased or held by a broker for the account of a customer is in the customer, the broker being merely a pledgee thereof as security for the payment of the customer's debt to the broker. Richardson v. Shaw, supra. And in Massachusetts, where it has been held that title to such

stock remains in the broker subject to his executory contract to deliver the stock to the customer upon the latter's payment of the purchase price in full (Wood v. Hayes, 15 Gray 375), the bankruptcy of the broker has been deemed to work a demand and tender by the customer wherefore title to the stock so acquired or held by the broker vests in the customer who can then obtain possession thereof from the trustee in bankruptcy by paying his debit balance. Leonard v. Hunt, 1 Cir., 36 F.2d 13, 15; In re Swift, 1 Cir., 112 F. 315, 318, 319.

[3] E. g., Margin Stocks, 35 Harvard Law Review (1922) 485, 489; The Rights of a Customer in Collateral Security Given a Stockbroker, 22 Columbia Law Review (1922) 155, 158; Rights and Obligations of Customers in Stockbrokerage Bankruptcies, 37 Harvard Law Review (1924) 860, 879.

[4] See Report of House Judiciary Committee, 75th Congress, 1st Sess.Rep. No. 1409 at p. 31.

was solvent, allocated to or physically set aside for such customers and so remained to the date of bankruptcy.

The differentiation in the instances above noted between cash customers owning property identifiable in the broker's hands and margin customers is quite understandable. It is one thing for Congress in the exercise of its constitutional power respecting bankruptcies to promote equality among claimants of the same standing, but it would be quite a different thing for Congress to defeat arbitrarily an independent property right by appropriating the ascertainable and unpledged property of one person for the augmentation of the bankrupt estate of another, merely because the former's property happened to be found in the possession of the latter. Cf. Gorman v. Littlefield, 229 U.S. 19, 25, 33 S.Ct. 690, 57 L.Ed. 1047. But this, Congress has neither done nor attempted when Section 60, sub. e is construed as we have hereinbefore construed it.

What we have already said applies equally to the claim of Freeman. He was likewise a cash customer prior to the broker's bankruptcy. Whether the transfer to Freeman of the shares which he had purchased and had fully paid for was the creation of an intended preference is a matter to be raised under other relevant provisions of the Bankruptcy Act as allowed for by paragraph (5) of Section 60, sub. e. As in the case of the other three claimants, Freeman is also entitled to reclaim.

The decrees of the District Court at Nos. 7720, 7721, 7722 and 7723 are affirmed at the costs of the bankrupt estate.